Our next case is PAPIERFABRIK. Mr. Farrin. The police court. Circumstances of this case are unique, just like they were unique when this case was before this court two years ago. The Commission's threat determination is based entirely on 48 grand. The Commerce's determination of dumping is based entirely on dumping margins for 55 grand, not 48. The Commission refused to take those worksheets into account in its original determination. On appeal, two years ago, this court remanded and said the Commission has to take into account the unique circumstances of this case, this unusual fact pattern, to make an equitable determination. So what did the Commission do? It did four things. First, it re-argued the class or kind. Secondly, it said the worksheets aren't a finding. Third, they tried to make whole or prove the negative about the future. And then finally, they cited a bunch of irrelevant information. Going back to number one, the entire class or kind. The Commission said the Commission cannot analyze the threat from only the subset of dumped merchandise, but has to decide based on the entire class or kind. But they argued that two years ago, and this court rejected that argument. That's why the court ordered the Commission to analyze the printout. Second, the Commission tried to dismiss the commerce worksheets by saying that the negative dumping margin for 48-gram is not a finding. But the Commission admits repeatedly that the worksheets show that none of the 48-gram product was dumped. This parsing is just a re-argument of their assertion two years ago that the Commission has to confine itself to the four corners of the Federal Register notice. Again, this statute says that they have to consider all subject matter with respect to which commerce has made an affirmative determination. That is correct, Your Honor. What does that require them to look at? That requires them to, it still requires them to connect the injury or threat of injury to the dumping. So you would say before you even look at that, you're looking at the by reason of language. Exactly, exactly. The by reason of. And this is not an... The only thing that's by reason of here is the dumped material, not the fairly traded. Exactly, exactly, Your Honor. Again, this parsing of the commerce worksheets, they tried to dismiss the commerce worksheets by saying that the negative dumping margin for 48-gram is not a finding. But the Commission admits repeatedly that none of the 48-gram was dumped. It's just a re-argument of the assertion that they made before and that they lost before. Now third, they tried to dress up a triple negative and call it substantial evidence. They say that even though there were no dumped sales of 48-gram in the past, there is no basis to conclude that it would not be dumped in the future. Mind you, the Commission presents no positive evidence whatsoever that Kohler would dump in the future, none whatsoever. So the Commission tries to make Kohler disprove the negative about the future, no less. I'm sorry, that's not substantial evidence. The only evidence on the record is that Kohler did not dump 48-gram product. Finally, they tried to point to a new Appleton plant that would allegedly lead to changed conditions in the future and claim that this shows that the Commission is weighing the evidence. But there is no weighing here. The Commission is wrong as a matter of law. The extent to which Kohler would compete with Appleton in the 48-gram segment in the future says nothing, I repeat, nothing about whether Kohler would dump in the future. It is entirely irrelevant. Dumping is not a question of what Kohler's prices are in the U.S. market versus Appleton's prices in the U.S. market. Dumping is a matter of what are Kohler's prices in the U.S. market versus Kohler's price in its own German home market. There is no evidence on the record in the Commission's determination that analyzes German home market prices. They can't make that inference without having German home market prices. Where do you have evidence on the record about German home market prices? In the commerce printout, the commerce printout that says there's no dumping. Even if the court accepts what the Commission says here, it's not substantial evidence. It's just confusing apples and oranges. Finally, this court should reverse. It's been four years since the original determination, and it's been two years since we were here the first time around. We've now gone through one, we've gone through two completed administrative reviews. We're now in the middle of a third one. Both of them were 3-3, right? Yes, it was a 3-3 determination, a 3-3 threat determination, the thinnest of margins. We've gone through administrative review. We're going through this torture year after year after year. And, you know, if you send this back down with very general instructions, they're going to dance around it again. The court shouldn't allow them to dance around this again. The court should give very specific instructions. Thank you. I'd like to reserve the right to talk now. Thank you, Mr. Baird. Mr. Bernstein. You'll need to watch your time, Mr. Bernstein, if you want to save any time. That, I will do so, Your Honor. Thank you. Your Honor, may I please the court, this case is not a re-argument of the case from two years ago. Kohler's arguments disregard two fundamental aspects of the commission's decision on remand. First, notwithstanding what you just heard, the commission fully complied with the court's January 2011 decision by considering materials from the commerce dumping investigation. The commission did not ignore the materials. The commission did not minimize the materials. The commission reopened the record. It looked at these materials. It actually got other materials from the commerce department as well. The commission acknowledged that the printouts indicated that the transactions of the 48-gram product that commerce investigated were in non-dump transactions during the period of the commerce dumping investigation, which was July 2006 through June 2007. Those dates are important because in this investigation, the original investigation, all the commissioners agreed that during that period of time, the domestic industry was not injured. What was happening was the domestic industry would be threatened with material injury in the imminent future. That future occurred after October 2008. Now, in the 16-month interval between June 2007 and October 2008, the commission found substantial changes in market conditions concerning lightweight thermal paper in the US. Yeah, and the reason is important, isn't it? Is it by reason of dumping that these market changes happened? Or is it the reason given in the dissenting opinion of commissioners Aronoff, Pearson, and Olkin, where they said, it's, and by the way, I couldn't even find it in the record. I had to go find this on my own. You didn't put this in the record, the dissenting opinion. And they said, the US market's already begun and will continue to shift towards the lighter, thinner, 48-gram product because, and they go on to say it's less costly and it has increased in efficiencies. The market is moving there, not because of dumping. It's because it's a better product. Your Honor, there was a factual difference between, your Honor's correct. There was a factual difference between commissioners Olkin, Aronoff, and Pearson and the other three commissioners concerning the issue of whether So we're guessing, aren't we? We're guessing, and when you're guessing and basing the guess on non-dumped products, where is the sense of this? This is a statute that precludes dumping, not protects against market changes. There are two elements to your question. Let me address each of them. First of all, with respect to their guessing, you're correct. And so it is correct that the three commissioners on either side were projecting future conditions and they projected them differently. Now, that is not unusual in commission determinations that their projections of future market conditions, and it's important to remember that the three dissenting commissioners did not rely on any of these arguments concerning the worksheets and what they contained. They found differences in likely price effects and likely volume effects. That was litigated before the Court of International Trade in 2010. The Court of International Trade found that, you know, notwithstanding that the commission was split 3-3 on this, the three who had voted affirmative, their factual findings were supported by substantial evidence. Court didn't appeal those aspects of the Court of International Trade's 2010 ruling to this court. It simply, what it did was it limited its appeal to the question of the commission, and all six commissioners did this, by the way, would refuse to consider these worksheets. And this court said, you, the commission, erred as a matter of law, you misinterpreted the Algoma case, you have to commit, you have to consider these worksheets. So the commission considered the worksheets on remand. The, again, the three dissenting commissioners dissented without having need to resort to the worksheets, so this did not, the worksheets did not affect their analysis, it did not change their analysis. The three, the commissioners who voted in the affirmative had to examine whether this was going to affect their analysis. And one of the things that they examined, pursuant to this court's prior opinion, was whether there was a disconnect between the import's threatening injury, and the. The statutory language required to look at the dumped products, because it says, by reason of, this is right back to Gerald Metals, and subsequent cases that emphasizes that language, doesn't that say, it's the dumped products you're looking at. Gerald Metals indicates there is a distinction between imports covered by the Commerce Affirmative Dumping Determination, and imports that are non-subject. Imports that are non-subject are imports from other countries, they're not subject to investigation, they may be imports in which commerce made a de minimis finding. However, in this case, Kohler. Or they may be fairly traded products. But your honor. Within the subject matter description. Your honor, your honor, I would not agree with that as the case, and in fact, Kohler concedes that commerce found that the merchandise here, including the 48-gram product, was subject merchandise. If this was subject merchandise, under the statute, where the commission is having to make a determination concerning imports of that merchandise. And so we, the result would be, taking your reasoning, is that we would impose dumping margin remedies on fairly traded goods, because they were grouped into a subject matter category with unfairly priced goods. So we're going to, just because we lumped them all together and we found one outlier category was dumped, we're going to penalize the whole category. Even though they were not responsible for any market harm or threat. Is that what you're trying to tell me? What I, that's not entirely what I'm trying to tell you. Not entirely, but it's, what's your telling me in substance? What I'm trying to tell you, well part of what I'm trying to tell you in this case is there is nothing in the record indicating that during the period after October 2008, the 48-gram imports were not dumped. There is nothing. And there's nothing to say they were either. We don't have German prices to compare with the U.S. prices. We don't have an analysis of dumping. But we do have an analysis of, first of all, under the Commerce Department law, these commerce findings are not prospective. These imports are subject to administrative reviews. Under the interpretation advanced by Kohler, the commerce ruling, these commerce calculations would have a prospective effect on the commission that they do not have on commerce. Who do I believe? Do I believe the three who say the threat is simply a change in the market, they're going to less costly, more efficient products? Or do we believe the three who say, well, in the subject matter category, some other products were dumped, so we think there may be a threat from these fairly traded goods? Your Honor, I. It seems like there's a bigger stretch in accepting the second than the first group. But Your Honor, we would argue that under a substantial evidence standard, that's not an appropriate inquiry. The appropriate inquiry is not which is the better reasoned determination. It is whether the determination of the three who voted affirmative is supported by substantial evidence. I'm looking at the statute, which says by reason of. It says, it doesn't say by reason of dumping. It says by reason of imports, you know, with respect to which the administrative authority has made an affirmative determination. Now, again, the affirmative determination is such that is what is basically, Congress characterizes the affirmative determination to be. Number one, and that was the class or kind of lightweight thermal paper. And number two, the, again, it requires injury by reason of a class of imports, not by dumping. But Congress never found the lightweight paper was dumped, is that right, the 48 grams? What Congress, Congress made calculations on several different product models. They included 48 grams, 55 grams, and some other weights as well. The finding was the calculation for the period July 2006 to June 2007 was negative for the 48 gram and positive for all the other products examined. Congress used that and used that, the 48 gram, to basically reduce the margin for everything else. But the subject merchandise, subject to the affirmative determination, was everything within the class or kind. Again, I see my time has expired. I would like to emphasize that the Commission did what it was instructed to do. It examined all the evidence in the record, and it took this information as one set, one of several relevant, different, relevant factors. It just found it did not outweigh the other factors, and we believe that determination is supported by substantial evidence in accordance with law. Thank you. Thank you, Mr. Bernstein. Mr. Dorn. Mr. Dorn has four minutes, and then we'll hear from you. Thank you, Your Honor. May it please the Court, three quick points. First, the ITC on remand corrected the only legal error that was identified by this Court in Curler 2 because it did carefully consider the information from the Commerce Department's computer printout, and it operated on the premise that back in the period of 2006 and 2007, there were non-dumped transactions for 48. So the only issue now is there's substantial evidence for the ITC's determination on remand, and this Court has always said it gives great weight to the informed opinion to the Court of International Trade with respect to issues of substantial evidence. In fact, it is always the starting point for this Court's analysis. And as the Court of International Trade... And we do it de novo. Your Honor, that's correct. We do it all over again. But the Court of International Trade, using the standard of review this Court articulated in Nippon Steel, found that there was substantial evidence for the Commission's determination, and I'll get back to that in a minute. The third thing I wanted to point out is the equities have shifted since we were here in September 2010 when Mr. Perrin stood up and said that a 48-gram product was not dumped and that they were going to get a zero margin in the first review. Well, that's all changed. There have been two reviews. There was dumping of product in both of those reviews. They admit that that was all 48-gram product. And in the third review, the margin is going to be a lot higher because they admit now that they provided false information to the Commerce Department in the third review. That'll be another case, won't it? Yes, Your Honor. But it's significant that the Commerce Department did not consider that it made a legal conclusion that 48-gram was taken off the table and was not dumped. That's not what Commerce thought. Commerce instructed customers to collect cash deposits on all lightweight thermal paper, including 48-gram paper. That's the problem, isn't it? Isn't that the heart of the question? Well, I think going back to earlier questions, I guess the question is, what is the determination that the Commerce Department made? And the statute's very clear that it only calls balls and strikes with respect to a class or kind of merchandise. It doesn't say a blue pen is dumped and a red pen is not dumped because they're just pens. And you have to take an average weight of dumping margin. And findings have to be published. The statute says they have to be published and known to the petitioner. My client, Appleton, didn't even know it was in the computer printout. That's a confidential record. Couldn't even appeal it. They wouldn't have known how to, it was just, it was nowhere in the record that they could see. That cannot be a finding. And that's one of the points the Commission made in its remand determination. The other point the Commission made is that the finding of non-dump transactions had very limited utility in the context of what it was trying to do in looking towards the imminent future. The Commission was trying to determine the impact of subject imports from Germany looking forward after October 2008. This computer printout line item concerned transactions back in 2006-2007. That might have been something the Commission would have given weight to if it had made an injury determination covering that period of time. But what the Commission says is that's not what we did. We're looking forward. We're looking into the imminent future. And so those data points from the past don't really have much relevance. The other thing the Commission pointed out, which I agree with completely, is that there was no basis for Commerce to make a legally binding determination with respect to 48 gram because it had not done the tests that are required to determine what the normal value would be for 48 gram product. I mean, Congress didn't intend for Commerce to make dumping calculations based on thin home markets. We know there weren't enough sales of 48 gram product in Germany so that Commerce could make a legally significant determination restricted to 48. It only applied the home market viability test to the class or kind of merchandise, and that's why its determination was limited to the class or kind of merchandise. And the statute makes clear the Commission is supposed to look at whether the domestic industry is threatened by reason of subject imports, that is the imports of which a determination has been made by Commerce, and that's the class or kind. Thank you, Mr. Dorn. Thank you, Your Honor. Mr. Farrin. Ultimately, you left the 48 in the same category with 55 conceivably to get a lower dumping margin because you knew that you had less evidence of dumping in that category. Aren't you stuck with your subject determination? No, Your Honor. We didn't. The reason we did this, we would have loved to have made a class or kind argument if we had a plausible class or kind argument to make. If we could have made a class or kind argument, and if the Commerce Department would have bought that, then what would happen is there would have been a zero dumping margin on the 48, or rather a big dumping margin on the 55. And you leave them together so you could get a middle ground dumping margin, and that helped you more, because at that time, 55 was the bigger product. Since then, it's shifted to the 48, and that's why you're here. Am I getting this right? No, Your Honor, because the ITC said all along that the 55 wasn't a problem. The Commission was unanimous about that. The 55 was not a problem. And take a look at the pricing product series on the 55, comparing the Appleton product to the Kohler product. Believe me, Kohler's pricing of 55 grand paper was not a problem here. So if this had gone to the ITC... You're saying it's not a problem? I thought it's not disputed that there was a dumping margin for the 55. You're correct. There's a dumping margin for the 55. That's a distinct issue for whether there's underpricing with respect to the 55. That's not before us. The question is the dumping margin. You're correct. What's before us is the dumping margin. But they're basing all of their arguments on threat of material injury, not on the dumping margin, but they're basing it upon the pricing series and what they see as a trend based on some point in the future about 48 grand product. Well, the 48 grand product was not dumped. And that's what the court needs to take... That may be their motivation for participating in these proceedings, but that doesn't change the legal issue before us. I'm sorry, Your Honor, I'm not quite sure I understand your question. You're saying that they're concerned because of the price differential in the United States market. Yes, it's the price differential in the United States market. And the Commerce Department found that the price differential in the United States market was that with respect to 48, the US prices were all higher than the home market prices. So what does that have to do with calculating the dumping margin? It has everything to do with calculating the dumping margin. If you look at page 3899 of the joint appendix, this is the computer printout. This is the relevant page. At the lower right-hand corner is the percent margin. This is where they calculate a dumping margin for each one of the models. See, there's 1, 2, 3, 4 that are positive there in the right-hand corner. And then there's one that is negative. You're saying that's not comparing the value, the fair value of the sales in the domestic market? Oh, it is comparing the domestic market sales to the German home market sales. And it's doing it on a model by model basis. In other words, they compare one variety of 55 in the US market to one variety of 55 gram in the home market. And then they take a look at another type of 55. And then the one at the very end is the comparison of 48. That shows the last line of this computer printout is the comparison of 48 gram prices in the US market versus the home market. And you'll notice there is a normal value here. There is a percent margin here. And that number is negative, which means there was no dumping. Now, the Commerce Department later goes on and comes up with an overall weighted average dumping margin. But that does not erase the data that's on the record. The data on the record and the fact that the other side has repeatedly admitted in their briefs that the 48 gram product was not dumped. And that is as clear as can be. Now, I would like to point to a couple of things that Mr. Dorn said that Appleton didn't know that the 48 gram wasn't dumped and so it couldn't appeal. Of course it could. We made this argument before the ITC because the preliminary determination showed exactly the same thing. That was in the record below. That's why we made the argument below that the commission has to take this into account. It makes no sense whatsoever. With regard to the viable home market test, again, keep in mind that this is something that the Commerce Department computes once for the entire class or kind. Once they do that, they don't then do a separate viable home market test for each individual model. And they didn't do that here. They computed normal values. They computed an actual dumping margin. Finally, Mr. Dorn wants to talk about, wants to do some Monday morning quarterbacking about what happened in the subsequent administrative reviews. That's not before the court. What he doesn't also point out is that first administrative review, as well as the second administrative review, are on appeal. We just had the oral argument for the first administrative review. And if you want to see the oral argument transcript, please be my guest. Please look at the oral argument transcript. But, you know, we just don't think that's relevant. Thank you, Your Honor. All right. Thank you, Mr. Stern.